James E. Cecchi
**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

[Additional Attorneys on Signature Page]

*Attorney for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DANIEL MCCARTHY, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ARC AUTOMOTIVE, INC., GENERAL MOTORS COMPANY, GENERAL MOTORS HOLDINGS LLC, and GENERAL MOTORS LLC,<br><br>Defendants. | Civil Action No. _____<br><br><br><br><br>**COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Daniel McCarthy ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following against ARC Automotive, Inc. ("ARC"), General Motors Company, General Motors Holdings LLC, and General Motors LLC (collectively "General Motors" and together with ARC as "Defendants") based upon personal knowledge as to allegations specifically pertaining to Plaintiff and, as to all other matters, upon the investigation of counsel.[1]

---

[1] Counsel's investigation includes an analysis of publicly available information, including Defendants' Technical Service Bulletins, National Highway Traffic Safety Administration documents, and consumer complaints. Plaintiff believes that a reasonable opportunity for discovery will provide further support for the claims alleged herein.

## I.     <u>INTRODUCTION</u>

1.      People trust and rely on the manufacturers of motor vehicles and of critical safety devices to make safe products that do not give rise to a clear danger of death or personal injury. An airbag is a critical safety feature of any motor vehicle. Airbags are meant to inflate rapidly during an automobile collision to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield.

2.      Both component manufacturers and automobile manufacturers must take all necessary steps to ensure that the products installed in the automobiles—which literally can make the difference between life and death in an accident—function as designed, specified, promised, and intended. Profits must take a back seat to safety for the manufacturers of airbag components, and also for the automobile manufacturer when it makes its product sourcing decisions.

3.      ARC is a leading manufacturer of airbag inflators, a critical safety device in all modern motor vehicles.  Airbag modules containing ARC hybrid inflators are installed in at least 40 million vehicles in the United States and everyday millions of people utilize these vehicles, by necessity, to carry-out their daily lives. They do so because they have no choice and in many cases they do so unaware that the simple act of driving to work, driving to the grocery store or driving to baseball practice, exposes them and their passengers to a hidden and potentially fatal defect lurking within the airbag module containing an ARC hybrid inflator.

4.      Since at least July of 2015, Defendants have been aware of an issue concerning hybrid inflators manufactured by ARC due to an ongoing National Highway Traffic Safety Association ("NHTSA") investigation into reports that ruptured inflators had dispersed shrapnel, injuring or even killing vehicle occupants.  Defendants should have been aware of the defective inflators from reports—such as—Lois Dutton being struck by a snowmobile as she turned in to

her driveway. In an interview, Ms. Dutton stated that she "saw a cloud of white smoke and a flash of white" as the airbag inflator ruptured upon impact. Shrapnel sliced through an artery in her neck, and she passed out. "It looked like someone had shot a gun at the windshield," she said. The inflator in Ms. Dutton's vehicle was manufactured by ARC.[2]

5.      Defendants have been well aware of the risks ARC takes with their poor production process and lack of quality controls during the manufacture of their hybrid inflators. Despite this knowledge, ARC continued to manufacture millions of inflators, install them into Class Vehicles, and advertise and sell them to members of the Class while failing to implement either a design change or process and quality control changes to eliminate the excess weld flash present in the defective inflators.

6.      As a result of Defendants placing profit over people, the Inflator Defect has caused 2 deaths and 4 injuries attributable to these inflators rupturing.

7.      This action seeks, to the extent it can, some measure of justice for those who have been harmed by the illegal and tortious acts described in this complaint. It seeks both compensatory and punitive damages in an amount reflective of the egregious nature of the defendant's conduct. It also seeks injunctive relief to compel ARC and the complicit and auto manufacturers to take immediate and effective action to either replace all of the defective airbag modules with airbag modules that do not contain inflators with the friction weld flash defect, or to immediately institute a re-purchase program to take all of the unsafe class vehicles off the road.

---

[2] *See* Hiroko Tabuchi, NEW YORK TIMES, Airbag Flaw Investigated at ARC Automotive (July 15, 2015), available at https://www.nytimes.com/2015/07/15/business/airbag-flaw-investigated-at-arc-automotive.html (last accessed Sep. 23, 2022).

## II.   <u>NATURE OF CLAIMS</u>

8.      This action concerns defective inflators manufactured by Defendant ARC Automotive, Inc. and its related entities ("ARC"), and equipped in vehicles manufactured by General Motors.[3]  As a result of a common, uniform defect—the presence of excess friction weld flash inside the inflators—instead of protecting vehicle occupants from bodily injury during accidents, these defective airbag modules too often violently explode, expelling metal debris and shrapnel at vehicle occupants.

9.      All of the inflators in the Class Vehicles suffer from the same design defect as follows:  the design of the inflators fails to account for the excess, asymmetrical, weld flash created through the friction welding process that is required to manufacture the inflators according to their design.  This excess, asymmetrical weld flash is created at the support tube inner diameter to upper pressure vessel interface during manufacturing. A portion of the weld flash can become dislodged during the deployment of the inflator in an accident.  If the dislodged weld flash is not large enough to block the gas exit orifice it will exit the inflator and enter the vehicle when the airbag is deployed.  If the dislodged weld flash is large enough to lodge in the gas exit orifice it will result in an increase of pressure in the inflator housing, causing a rupture ("Inflator Defect" or "Defect", airbags containing inflators with the Defect are referred to as "Defective Airbags").

10.     Worse yet, ARC ran manufacturing plants rife with glaring and persistent manufacturing and quality control problems that exacerbated its decision to design the friction weld between the upper pressure vessel and center support causing the Inflator Defect.  As described below, an ongoing investigation by NHTSA revealed widespread manufacturing

---

[3] Plaintiff reserve the right to name additional vehicle and original equipment manufacturers that have equipped their vehicles with airbags that contain the defective inflators.

deficiencies, and a lack of any quality assurance control—which contributed to producing the defective inflators.

11.     As a result of Defendants' misconduct, Plaintiff and members of the proposed Class were harmed and suffered actual damages. The Defective Airbags containing the Inflator Defect significantly diminish the value of the cars in which they are installed.

12.     Plaintiff and the Class did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the defects been disclosed.

## III.   PARTIES

### A.     Plaintiff

13.     Plaintiff Daniel McCarthy ("Plaintiff") is an individual residing in Lake Hopatcong, New Jersey. Plaintiff purchased a 2011 Chevrolet Silverado 1500 (for purposes of Plaintiff's allegations, the "Class Vehicle") for personal, family, and/or household use in 2011 from Schumacher Chevrolet of Denville, New Jersey (f/k/a Gearhart Chevrolet). At the time, Plaintiff reasonably expected that the airbags in the Class Vehicle would not contain the Inflator Defect.

14.     Plaintiff had no way of knowing the Class Vehicle contained the Inflator Defect that could cause the airbags to rupture. To the contrary, before acquiring the Class Vehicle, Plaintiff viewed or heard commercials and reviews through television, radio, and/or the internet that touted the safety and reliability of the Class Vehicle. Defendants concealed the existence of the Inflator Defect from Plaintiff and consumers. Plaintiff would not have purchased the Class

Vehicle, or would have paid less for it, if Defendants did not conceal material information about the Inflator Defect and as a result, the value of Plaintiff's Class Vehicle has diminished.

### B. **Defendants**

15.     Defendant ARC Automotive, Inc. ("ARC") is a Delaware corporation, with manufacturing facilities in Morgantown, Kentucky and Hartsville, Tennessee, among others. ARC is a global manufacturer that produces a full complement of inflators for automotive airbag applications. ARC can be served through its registered agent, The Corporation Trust Company, 1209 Orange Street, Corporation Trust Center, Wilmington, DE 19801. ARC is the manufacturer of the Defective Airbags that are the subject of this Complaint.

16.     General Motors LLC ("General Motors LLC") is organized in Delaware and maintains its executive offices at 300 Renaissance Center, Detroit, Michigan. The sole member of General Motors LLC is General Motors Holdings LLC.

17.     General Motors Holdings LLC ("General Motors Holdings") is organized in Delaware and maintains its principal executive offices in Detroit, Michigan. The sole member of General Motors LLC is General Motors Company.

18.     General Motors Company ("General Motors Parent") is a Delaware corporation with its principal executive offices in Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. General Motors Parent's only asset is its 100% ownership interest in General Motors Holdings. General Motors Parent is also responsible for making reports to NHTSA related to vehicle safety and deciding on vehicle recalls.

### IV. **JURISDICTION AND VENUE**

19.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because Plaintiff and members of the proposed Class are citizens of states

different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

20.     This Court has personal jurisdiction over General Motors under 18 U.S.C. § 1965(d) because it is found, has agents, or transacts business in this District. General Motors maintains 87 primary suppliers in New Jersey (direct and indirect) with a purchase order current within the last 365 days, 79 active dealers in New Jersey and delivered 58,177 vehicles in New Jersey just in 2020 alone.[4] ARC maintains contractual relationships with General Motors to supply component parts with the intent they be installed and sold in Class Vehicles, including sales to a network of dealerships in New Jersey.

21.     This Court has personal jurisdiction over General Motors and ARC because this suit arises out of their contacts with New Jersey, and Defendants have availed themselves of the privilege of conducting business in this jurisdiction, Plaintiff purchased his Class Vehicle in this jurisdiction, resides in this jurisdiction, and was harmed in this jurisdiction. Plaintiff brings this suit in this jurisdiction because he has suffered injuries from Defendants misrepresentations and omissions concerning the defective and dangerous nature of the Defective Airbags.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District. Defendants caused harm to Plaintiff, as well as hundreds of members of the Classes residing in New Jersey. Venue is also proper under 18 U.S.C. § 1965.

---

[4]   General Motors in New Jersey, GENERAL MOTORS, https://www.gm.com/our-company/us/nj.html (last visited June 2, 2022)

## V.      **SUBSTANTIVE ALLEGATIONS**

### A.      **ARC is a Major Manufacturer of Airbag Inflators.**

23.      Defendant ARC is a global manufacturer that produces a full complement of inflators for automotive airbag applications (driver, side, head, knee, seat, seatbelt, and curtain). ARC advertises its core values as "safety, people, commitment, integrity, and communication."

24.      On information and belief, ARC Automotive, Inc. is located in Knoxville, TN, United States and is part of the Motor Vehicle Parts Manufacturing Industry. ARC Automotive, Inc. has 439 total employees across all of its locations and generates $101.81 million in sales (USD). (Sales figure is modelled). There are 13 companies in the ARC Automotive, Inc. corporate family.

25.      ARC claims to maintain "safety" and "integrity" as core values, yet ARC has failed to live up to these assurances by inter alia:

>      a.      manufacturing, distributing, and selling airbags that can cause serious bodily injury or death;

>      b.      intentionally concealing the foregoing from Plaintiffs, Class members, and federal regulators; and

>      c.      making incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs, Class members, and federal regulators that contradicted these representations.

### B.   ARC's Defectively Designed and Manufactured Inflators

#### 1.   ARC's Poor and Dangerous Design And Production Process

26.     Defendant ARC has offered its Vehicle Manufacturer Defendants a variety of drivers and passenger hybrid toroidal inflators since 2001. All ARC hybrid toroidal inflators share the same "donut" housing shape.

27.     The ARC designations of their driver's hybrid toroidal inflators are CADH/DH-7 (single stage) and DCADH (dual stage). The passenger designations are PH7-90, PH7-120 (single stage) and PH7-120, DPH7 (dual stage).



28.     The ARC hybrid design inflator relies on two distinct sources of energy. The inflator fills the air bag cushion by releasing an inert gas stored in the inflator at high pressure. This gas mixture is augmented by an ammonium nitrate-based propellant. The pressurized gas mixture and propellant are contained entirely within a hermetically sealed steel housing and is therefore isolated from external atmospheric conditions. The ARC hybrid inflators are manufactured in both single stage and dual stage designs.

29.    All ARC hybrid inflators utilize friction welding to join the three inflator housing components together. The housing components of the ARC hybrid inflators consist of an upper pressure vessel, a lower pressure vessel and a center support.



30.    Friction welding is welding technique in which heat is generated by mechanical friction between a moving component and a stationary one, while at the same time applying a lateral force called an 'upset' to the parts, in order to plastically displace and fuse the material.



31.     The ARC hybrid inflators utilize three separate friction welds. The first friction weld (1) is between the lower pressure vessel and the center support. The second friction weld (2) is between the center support and the upper pressure vessel. The third and final friction weld (3) joins the lower and upper pressure vessels together. Friction welds 2 & 3 are performed during the same operation.



32.     Flash is created during the friction welding process as the components are being welded together. Controlled and consistent flash creation is a normal and expected by-product of the friction welding process.

33.     When friction welding tube shaped components such as the center support flash is generated on both the inner and outer diameters of the tube where it interfaces with the pressure vessel.



3D Model showing center tube to lower pressure vessel flash



Actual part showing center tube to lower pressure vessel flash

34.     An example of the expected, normal flash created on the inner diameter of the support tube of the ARC hybrid inflator during the friction welding of the support tube to the pressure vessel is shown below.



35.     If certain parameters, such as part to part alignment, rotational speed or the force applied to the parts being welded are out of specification during the friction welding process excess flash can collect at the mating points of the parts being welded.

36.     The design defect involves the friction weld between the upper pressure vessel and the center support which is adjacent to the gas exit port where excess, asymmetrical weld flash is

being created at the support tube inner diameter to upper pressure vessel interface. Examples of this from random ARC hybrid inflators collected from the field are shown below.



37.     During deployment it is possible for a portion of the excess weld flash to break free from the friction weld and travel to the adjacent gas exit orifice. If the dislodged weld flash is not large enough to block the gas exit orifice it will exit the inflator. If the dislodged weld flash is large enough to lodge in the gas exit orifice it will result in an increase of pressure in the inflator housing.

38.     As the internal pressure of the inflator increases due to the gas exit port restriction the toroidal housing expands from the toroid shape to more of a ball shape until it reaches the point of rupture.

39.     When a rupture of an ARC hybrid inflator takes place the potential to injure the occupants will depend on whether the inflator was on the driver's or passenger side.

40.     The orientation of the driver's inflator in ARC hybrid inflator equipped vehicles puts the driver at greater risk than a right front passenger in a vehicle where the passenger side ARC hybrid inflator ruptures.

41.     During a driver side rupture of ARC hybrid inflator, the inflator housing expands due to the excessive internal pressure. The center support is restricting the expansion and will be stretched as the housing expands. It stretches at its weakest point which are the stage 1 and stage 2 gas ports located at the middle of the center support and will fracture under tension at this point.

Once the center support fractures the gas exit port end of the center support breaks free of the upper pressure vessel and is propelled towards the driver.

42.    When the inflator housing ruptures the internal parts of the inflator are propelled into the passenger compartment which can injure the occupants.

43.    In addition to propelling one half of the center support and the inflator internal components towards the driver the module assembly will often break free of the steering wheel and travel towards the driver all of which can cause injury or death.[5]

### 2.    ARC's Deficient Manufacturing and Quality Control

44.    ARC ran manufacturing plants rife with glaring and persistent manufacturing and quality control problems that exacerbated its decision to design the friction weld between the upper pressure vessel and center support to create the Inflator Defect.  As described below, there exists an ongoing investigation by NHTSA into the lack of adequate quality assurance controls both of which contributed to producing the defective inflators.

45.    In an October 2016 letter published by NHTSA, the agency criticized ARC for failing to uphold quality control in its facilities. The letter stated in relevant part:

> Additionally, a number of incidents involving ARC's product have been brought to NHTSA's attention by vehicle manufacturers and other suppliers. These incidents range from testing failures to recalls, and raise serious questions regarding the quality and integrity of ARC's air bag inflators. While vehicle manufacturers and other suppliers have voluntarily notified NHTSA of these and other incidents without the need for a formal request, ARC has failed to take any steps to notify the Agency of these incidents, or their potential relationship to the incidents under investigation. After the Agency learned of one of these incidents earlier this year, the Agency contacted ARC and indicated that the company needed to provide this

---

[5] The mounting position and location of passenger ARC hybrid inflators in the dashboard reduce but do not eliminate the chance for injury or death. The passenger ARC hybrid inflators are mounted in a slightly angled vertical position with the gas exit port pointing towards the windshield. This orientation and the inflator's location in the dashboard prevent the type of injuries associated with the driver's inflators. In fact, NHTSA as part of their information request for EA16003 have requested the mounting angles for all passenger ARC hybrid inflators from the OEMs.

type of information to NHTSA proactively. Instead of noting the serious nature of these incidents and committing to work with NHTSA to determine the appropriate range of issues at hand, ARC's counsel stated that they had no obligation to provide such information and chastised Agency staff for indicating otherwise.[6]

46.     Further, on information and belief, ARC failed to implement meaningful manufacturing process changes and effective quality control systems until 2018. After which time, they implemented manufacturing process changes including a system to visually inspect 100% of the upper vessel to support tube friction welds prior to sale. Implementing this quality control measure sooner was a preventable means to stop inflators containing the Inflator Defect from reaching consumers.

47.     This is not the first time that ARC has been accused of improper/defective welding. During the infamous Takata recalls, the bankrupt successor entity to Takata Corporation, TK Holdings, Inc. brought suit against ARC alleging that ARC provided Takata with defective inflators caused TK Holdings' customer (General Motors) to issue a recall on its vehicles manufactured during the period the defective inflators were supplied by ARC. TK Holdings, Inc. alleged inter alia damages arising from breach of contract.

48.     As alleged by TK Holdings, Inc.:

ARC's inflators failed due to improper/defective welding. Indeed, upon information and belief, ARC failed to properly train its weld operators, failed to provide standard work instructions for its weld operators, failed to properly post visual inspection standards at weld work stations, and welding equipment was not properly cleaned and maintained, among other failures.

49.     As aptly stated by TK Holdings, Inc., the successor to the infamous Takata Corporation, "[t]he inflators provided by ARC were not reasonably fit for their intended, anticipated, or reasonably foreseeable use." Accordingly, the defective inflators suffered from the additional issue of poor process control.

---

[6] Nat'l Highway Traffic Safety Admin., EA16-003, Ltr to ARC Automotive, Inc., Aug. 9, 2016.

### C.    ARC Inflator Failures and Defendants' Inadequate Reaction

#### 1.  Early Injuries and Deaths Spur Investigation

50.    There have been at least seven known field ruptures of ARC's Defective Inflators in vehicles, including six driver inflators and one passenger inflator. Two of those ruptures resulted in a driver fatality while the injuries suffered were often life threatening and life changing in their severity. Additionally, multiple passenger inflators have ruptured during Lot Acceptance Testing. Five of the ruptures resulted in significantly limited lot-based recalls of other vehicles that contained inflators only from the suspect lot.

51.    The ruptures have occurred in various states that do not share similar climates, unlike the hot and humid climates in which Takata ruptures often occur. The defective Inflators themselves were made at various ARC factories and include both dual-stage (which has a two-stage deployment based on the severity of the crash) and single-stage (which deploys at the same rate no matter the crash severity) and cover both driver and passenger side applications. These facts strongly suggest a systemic design defect in the inflators.

52.    They also confirm that the root cause of the ARC hybrid inflator ruptures is not confined to scenarios involving moisture intrusion and differ significantly from the root cause of the Takata inflator ruptures. The stored gas nature of the ARC hybrid inflator which utilizes inert gas at an approximate pressure of 3500psi ensures the inflator is truly hermetically sealed and therefore moisture intrusion is not possible.

53.    In January 2009 in Ashtabula County Ohio an ARC DCADH ruptured in a 2002 Chrysler Town and Country minivan severely injuring Lois Dutton. According to Dutton "It broke my jaw in three places. Collapsed a lung," she explained. It even sent a bolt right through her chest and out her back. She spent three months in a medically-induced coma after the incident, and faces hundreds of thousands of dollars in medical bills.

54.     The Dutton ARC rupture was attributed to a "single isolated event" and no actions were taken. This is very similar to what occurred in the Takata recall with what is known as Event Zero. Event Zero was the first field rupture of a Takata PSAN PSDI inflator but instead of performing a thorough investigation Takata and Honda wrote it off as an "anomaly" and only took any action when additional field ruptures took place 3 years later.

55.     In June of 2015 NHTSA became aware of an ARC driver inflator rupture that occurred on April 8, 2014, in New Mexico on a 2004 Kia Optima. The ARC inflator in this incident was a single stage driver's inflator designated "CADH" made at ARC's Knoxville, Tennessee, facility which ruptured during a frontal impact crash. The driver suffered serious injuries.

56.     The driver sued Kia Corp. and Kia America, Inc., under their previous names, and the lawsuit was settled quickly. Kia did not issue a recall.

## 2.     Ongoing NHTSA Investigation

57.     As a result of the ruptures of the ARC hybrid inflators in the 2002 Town & County minivan and the 2004 Kia Optima NHTSA opened Preliminary Evaluation 15-027 (PE15-027) in July 2015 stating "Both driver air bag inflators were manufactured by ARC, a tier-two supplier of automotive air bag systems, at their manufacturing facility in Knoxville Tennessee. All ARC driver air bag inflators are a hybrid design that fills the air bag by releasing an inert gas mixture stored in the inflator at high pressure."

58.     In July 2016, NHTSA was informed by Transport Canada of a fatal incident involving a driver air bag rupture in a 2009 Hyundai Elantra. The inflator was identified as an ARC CADH single stage inflator manufactured at ARC's facility in China. The nature of the fatal injury suffered by the driver of the 2009 Hyundai Elantra was found by an autopsy to have been caused by a "penetrating neck injury secondary to motor vehicle accident."

59.     On August 4th, 2016, as a result of the fatality occurring in Canada because of an ARC inflator rupture NHTSA upgraded its Preliminary Evaluation 15-027 of ARC Automotive Inc. airbag inflators to an Engineering Analysis 16-003 (EA16-003) stating in part "[i]t was determined that incident inflator was manufactured by ARC and had ruptured in substantially the same manner as the two previous incidents known to ODI. The driver air bag module in the subject 2009 Hyundai Elantra utilized a single-stage inflator manufactured at ARC's facility in China. ARC confirmed that the inflator in the 2009 Hyundai Elantra was substantially the same design as the single-stage inflator in the 2004 Kia Optima and was assembled using substantially the same manufacturing process."

60.     On October 4, 2016 Michael Brown, NHTSA Acting Director of Office Defect Investigation, wrote in a letter that ARC had failed to notify NHTSA of multiple incidents involving ARC products. Further, it stated "[t]hese incidents range from testing failures to recalls and raise serious questions regarding the quality and integrity of ARC's air bag inflators." According to this statement there were both testing failures and recalls associated with ruptures involving ARC hybrid inflators but there are no supporting documents provided within the publicly available EA-16003 file.

61.     According to the opening resume of EA-16003 the focus of NHTSA's investigation will be to identify the population of ARC inflators in the U.S.:

> ODI's investigation will focus on determining the entire US population of ARC manufactured driver air bag inflators, single- and dual-stage, identification of affected vehicle manufacturers, and whether any single-stage driver air bag inflators manufactured at ARC's facility in China were used in vehicles produced for sale or lease in the United States. Additionally, ODI will conduct a program to recover the subject ARC inflators from vehicles in the field for further testing and evaluation in support of root cause analysis.

62.     This indicates that NHTSA oversaw and participated in a root cause analysis of the ARC hybrid inflator defect similar to that conducted in the Takata recall yet there are no publicly

available documents available to confirm this. On the contrary, NHTSA's Takata root cause analysis included the ballistic testing and dissection of over 340,000 Takata inflators.

63.     According to the Associated Press, NHTSA characterized ARC as "stonewalling" its investigation into this fatal car crash, and threatened a large fine over the lack of cooperation.[7] ARC had reportedly missed deadlines and failed to report crash information and test results as required by law.  The failures "raise serious questions regarding the quality and integrity of ARC's air bag inflators," the agency wrote in its Oct. 4 letter to the company.

64.     ARC questioned whether it needs to give NHTSA the information has failed to provide documents in a readable format and has "appeared nonchalant" in developing a plan to test the inflators, the Oct. 4th letter said. "Instead of noting the serious nature of these incidents earlier this year and committing to work with NHTSA to determine the appropriate range of issues at hand, ARC's counsel stated that they had no obligation to provide such information and chastised agency staff for indicating otherwise," said the letter from Michael Brown, acting director of NHTSA's Office of Defects Investigation.

65.     The agency threatened to hold a public hearing and fine the company up to $21,000 per day to a maximum of $105 million.

D.     **Mounting Deaths and Belated Recalls**

66.     As of May 13, 2022, there has been limited public disclosure of the data requested by NHTSA from the defendant OEMs or ARC. The original requests for information surrounding the ARC inflator ruptures are dated August 4, 2016. The most recent documents provided to the public on the NHTSA website are dated from May 27, 2021 to June 28, 2021 and only involve

---

[7] Tom Krisher, *US air bag parts maker is stonewalling probe of death*, ASSOCIATED PRESS, available at https://ktvo.com/news/auto-matters/us-air-bag-parts-maker-is-stonewalling-probe-of-death (last access Sep. 26, 2022).

discussion of extending the deadline for the turning over the requested documents. In fact, according a memo dated April 13, 2021 NHTSA states:

> The manufacturer's response to the Office of Defect Investigation (ODI)'s information request for this investigation is being reviewed and redacted to remove all personally identifiable information (PII) as required by federal law. These responses are usually complex, contain a large volume of documents, and require additional time for review and redaction. The public version of the response will be posted to this investigation file when available. While ODI's investigation is ongoing, we recommend that you periodically review this investigation file for additional documents and updates.

67. Over one year has passed since NHTSA claimed the public version of the documents would be made available and not one document has been made available as of May 13th, 2022.

68. On March 21st, 2017, BMW issued recall 17V-189 for 36 vehicles equipped with ARC DPH-7 passenger front inflators. The DPH-7 uses the same friction welding process as both the CADH and DCADH. According to the Part 573 Safety Recall Report :

> Depending on the circumstances, impaired gas flow could create excessive internal pressure, which could result in the body of the inflator rupturing upon deployment. Metal fragments could pass through the air bag cushion material, which may result in injury or death to vehicle occupants.

69. On August 31st, 2017, Ford issued recall 17V-529 for 650 2017 F150 & Mustang vehicles equipped with ARC's PH7-120 dual stage passenger inflator which uses the same friction welding process as the DPH-7, CADH and DCADH. According to the Part 573 Safety Recall Report :

> July 31, 2017, The Tier 1 airbag module supplier notified Ford of an abnormal deployment of a passenger Airbag (PAB) inflator during a Lot Acceptance Test (LAT) conducted at the supplier's engineering facility. The inflator ruptured during full output at +65 Celsius.

70. During August 2017 the concern was reviewed by Ford's Critical Concern Review Group (CCRG). Preliminary analysis indicates that weld flash from the inflator canister welding

process at the Tier 2 inflator supplier may obstruct the gas exhaust port. LAT testing frequency was increased and a Design of Experiments was initiated to further evaluate potential factors.

71.     According to the documents included in the EA-16003 document request ARC implemented equipment and process improvements on all toroidal inflator assembly lines on January 31, 2018.

72.     On April 11th, 2018, Transport Canada issued Recall #2018-173 for 2,022 - 2009 Hyundai Elantras. This recall was performed to collect parts for Transport Canada defect investigation 3280-38-10 to aid in the analysis by Hyundai and Transport Canada. The recovery program ended on 2/5/2020 with a note stating: "No safety defect has been identified with these vehicles and this action is not being conducted under the requirements of the Motor Vehicle Safety Act."

73.     On January 31st, 2019, General Motors issued recall 19V-019 for 1,145 2010-2011 Chevrolet Malibu vehicles based on a field report of an inflator rupture. According to the Part 573 Safety Recall Report:

> On November 30, 2017, an attorney contacted GM and claimed that, on September 22, 2017, the front-driver airbag inflator in a 2011 Chevrolet Malibu ruptured during a crash-related airbag deployment and injured his client.
>
> On December 6, 2017, GM reported the allegation to NHTSA under Standing General Orders 2015-01and 2015-02. To date, GM has filed 13 supplemental General Order reports updating NHTSA on the status of its investigation of the incident.
>
> From November 30, 2017, through December 13, 2018, GM made multiple attempts, through the claimant's attorney and other means, to locate and inspect the vehicle to confirm whether a rupture occurred. GM was not permitted to inspect the vehicle until December 13, 2018, on which date a GM engineer inspected the vehicle and components. Based on that inspection, GM determined that the front-driver airbag inflator in the subject vehicle likely over pressurized and ruptured during deployment.
>
> On December 19, 2018, GM presented the inspection photos and its preliminary analysis to NHTSA. On December 20, 2018, GM's Safety Field Action Decision

Authority (SFADA) decided to conduct a safety recall on the ARC inflators built in the suspect manufacturing lot. GM is not aware of other rupture allegations involving this ARC inflator in GM vehicles.

74.     On Wednesday, October 13, 2021 the National Highway Traffic Safety Administration posted recall documents filed by General Motors that revealed the second death, the driver of a 2015 Chevrolet Traverse SUV with an ARC inflator that blew apart, spewing shrapnel. No details were given about where and when the death occurred.

75.     On August 15, 2021, a driver in Calumet, Michigan, was killed due to a rupture of the ARC driver hybrid inflator in her 2015 Chevrolet Traverse. The victim, who was driving with two of her children as passengers, collided with an oncoming vehicle that crossed into her lane, and her airbag deployed.

76.     According to the police investigation, "It appeared that the driver's side airbag malfunctioned causing it to detach from the steering column and sent metal fragments into the driver's compartment of the vehicle. The igniter for the front driver's side airbag was found on the passenger side dashboard. There was also metal shrapnel on the driver's side dash, in the instrument cluster and markings on the driver's side roof which appeared to come from the driver's side airbag."

77.     The police investigation report noted that the autopsy of the victim found parts of the metal airbag inflator lodged in her neck. The other passengers in the victim's vehicle, including an unbelted right front passenger and occupants in the second and third row seats, survived the crash.

78.      GM sent a contract field investigator to examine the vehicle on September 8, 2021, and on September 14, 2021, another GM field investigator accompanied by the police investigator performed x-rays on the metal shards that were removed during the autopsy. Further inspection of

the vehicle and airbag pieces were examined by counsel representing the victim's family, plaintiff's expert, GM, ARC, and Toyoda Gosei (the Tier 1 supplier to GM) on October 27, 2021.

79.      On October 7th, 2021, General Motors issued recall 21V-782 for 550 2008-2017 Buick Enclave and 2013-2017 Chevrolet Traverse vehicles based on the August 15, 2021 field report of an inflator rupture. On October 21st, 2021, the number of affected vehicles was updated to 552 on an Amended Part 573 Report. The 2015 Chevrolet Traverse at the root of Recall 21V-782 is equipped with an ARC dual stage DCADH on the driver's side. According to the Part 573 Safety Recall Report:

80.      On October 20th, 2021, just south of Lexington Kentucky there was another rupture of an ARC hybrid driver inflator involving a second 2015 Chevrolet Traverse. The date of the accident is based on General Motor's EWR report submitted in May of 2022.

81.      Based on this incident defendant General Motors issued Recall 22V246 on April 14th, 2022, for 2,687 vehicles including:

        a.      2015 Buick Enclaves (542)

        b.      2015 Chevrolet Traverse (1183)

        c.      GMC Arcadias (962)

82.      The chronology listed in the Recall 22V246 Part 573 report states:

On November 9, 2021, GM received a claim letter from an attorney representing the owner of a 2015 model year Chevrolet Traverse that was involved in a crash. On February 18, 2022, the claimant alleged that the front-driver airbag inflator in the vehicle ruptured during the crash.

GM was provided an opportunity to inspect the vehicle on March 23, 2022. GM determined, at that inspection, that the front driver airbag inflator in the subject vehicle ruptured during the crash deployment.

On April 7, 2022, GM's Safety and Field Action Decision Authority decided to conduct a safety recall on all front driver airbag modules containing an inflator from the same manufacturing lot as the inflator under investigation. GM is continuing to

investigate this incident. GM's investigation has not identified another rupture allegation involving the vehicles in this recall population.

83.     The approach taken by the Defendants in addressing this ongoing manufacturing defect has been to wait until an incident occurs and then recall the vehicles effected by the specific lot of inflators that were produced at the same time as the failed unit. A reactive rather than proactive response.

84.     Recall 22V246 represents the second field rupture of an ARC hybrid inflator in a 2015 Chevrolet Traverse equipped with a driver's ARC DCADH inflator and exemplifies that the "lot based" recall strategy being applied to the ARC hybrid inflator ruptures doesn't work.

85.     As demonstrated by the ongoing nature of the ruptures and the fact they cover most of the toroidal hybrid inflators Defendant ARC offers it is obvious that the manufacturing process controls and quality control measures in place at the time of manufacture of the defective ARC inflators were not sufficient to have caught the defect prior to the defect inflators being installed in vehicles which would ultimately be utilized by unaware drivers.

86.     Upon information and belief, the Defendants manufacturing controls and records do not allow them to identify defect lots prior to a field rupture taking place. Likewise, there is not a field-based inspection that can be performed to identify inflators with the friction weld manufacturing defect. There are only two approaches available, 1.) Recall all ARC hybrid toroidal inflators OR 2.) Wait until another field rupture takes place and recall the inflators of the same lot.

87.     The Defendants "Wait and See" approach places drivers and passengers of vehicles that utilize an ARC hybrid toroidal inflator at risk. The two drivers of the 2015 Chevrolet Traverses were the latest guinea pigs the Defendants used to identify 2 defective lots of ARC inflators and they will not be the last unless all ARC hybrid toroidal inflators are recalled.

88.     In fact, in the October 4th, 2016, letter from NHTSA to ARC's Chief Executive Officer ARC's position on the serious of the matter was called out quite clearly by Michael Brown, Acting Director Offices of Defect Investigation:

89.     ARC's response to the Agency's investigation to date does not demonstrate the behavior that NHTSA expects of manufacturers, much less manufacturers of vital safety components utilized in vehicles across the globe. To the contrary, ARC's behavior has demonstrated a lack of cognizance regarding the seriousness of this investigation and the underlying issues.

90.     The following table identifies, to the best of Plaintiffs' understanding, and without the benefit of discovery, the vehicles equipped with an ARC hybrid inflator, the model years involved, the installed position of ARC hybrid inflator (driver side, passenger side, or both)

| Defendant | Make | Model | MY |
|---|---|---|---|
| FCA | Chrysler | 200 | 2015-2017 |
| FCA | Chrysler | 300 LX | 2016-2017 |
| FCA | Chrysler | PT Cruiser | 2001-2002 |
| FCA | Chrysler | Town & Country | 2001-2007 |
| FCA | Dodge | Caravan | 2001-2007 |
| FCA | Dodge | Challenger | 2015-2017 |
| FCA | Dodge | Charger/Magnum LX | 2016-2017 |
| FCA | Dodge | Grand Caravan | 2001-2007 |
| FCA | Jeep | Cherokee | 2016-2017 |
| Ford | Ford | Crown Victoria | 2004-2011 |
| Ford | Lincoln | Town Car | 2004-2011 |
| Ford | Mercury | Grand Marquis | 2004-2011 |
| Ford | Ford | F150 | 2015-2017 |
| Ford | Ford | Mustang | 2015-2017 |
| General Motors | Buick | Envision | 2016-2017 |
| General Motors | Buick | LaSabre | 2002-2005 |
| General Motors | Buick | Terraza | 2005-2008 |
| General Motors | Buick | Enclave | 2008-2017 |
| General Motors | Buick | Encore | 2013-2017 |
| General Motors | Buick | LaCrosse | 2005-2009 |
| General Motors | Buick | Lucerne | 2006-2011 |
| General Motors | Buick | Rainier | 2004-2007 |

| General Motors | Buick | Rendezvous | 2002-2007 |
|---|---|---|---|
| General Motors | Cadillac | ATS | 2013 - 2017 |
| General Motors | Cadillac | CTS | 2003-2007 |
| General Motors | Cadillac | CTS | 2008-2014 |
| General Motors | Cadillac | CTS | 2014 - 2017 |
| General Motors | Cadillac | Deville | 2002-2005 |
| General Motors | Cadillac | DTS | 2006-2011 |
| General Motors | Cadillac | ELR | 2013-2016 |
| General Motors | Cadillac | Escalade 1500 | 2002-2006 |
| General Motors | Cadillac | Escalade 1500 | 2007-2014 |
| General Motors | Cadillac | Escalade 1500 | 2015-2017 |
| General Motors | Cadillac | Escalade ESV | 2002-2006 |
| General Motors | Cadillac | Escalade ESV | 2007-2014 |
| General Motors | Cadillac | Escalade ESV | 2015-2017 |
| General Motors | Cadillac | Escalade EXT | 2002-2006 |
| General Motors | Cadillac | Escalade EXT | 2007-2013 |
| General Motors | Cadillac | SRX | 2004-2009 |
| General Motors | Cadillac | SRX | 2010-2016 |
| General Motors | Cadillac | STS | 2005-2007 |
| General Motors | Cadillac | XLR | 2004-2009 |
| General Motors | Cadillac | XT5 | 2017 |
| General Motors | Chevrolet | Avalanche 1500 | 2002-2006 |
| General Motors | Chevrolet | Avalanche 1500 | 2007-2013 |
| General Motors | Chevrolet | Avalanche 2500 | 2002-2006 |
| General Motors | Chevrolet | Camero | 2010-2015 |
| General Motors | Chevrolet | Camero | 2016-2017 |
| General Motors | Chevrolet | Captiva | 2011-2017 |
| General Motors | Chevrolet | Cavalier | 2000-2005 |
| General Motors | Chevrolet | Colorado | 2015-2017 |
| General Motors | Chevrolet | Corvette | 2005-2013 |
| General Motors | Chevrolet | Cruze | 2016-2017 |
| General Motors | Chevrolet | Encore | 2014-2017 |
| General Motors | Chevrolet | Equinox | 2005-2009 |
| General Motors | Chevrolet | Equinox | 2010-2017 |
| General Motors | Chevrolet | Express 1500 | 2003-2017 |
| General Motors | Chevrolet | Express 2500 | 2003-2017 |
| General Motors | Chevrolet | Express 3500 | 2003-2017 |
| General Motors | Chevrolet | HHR | 2006-2010 |
| General Motors | Chevrolet | Impala | 2006-2014 |
| General Motors | Chevrolet | Impala | 2015-2017 |
| General Motors | Chevrolet | Malibu | 2004-2007 |
| General Motors | Chevrolet | Malibu | 2008-2012 |
| General Motors | Chevrolet | Malibu Maxx | 2004-2007 |

| General Motors | Chevrolet | Monte Carlo | 2006-2017 |
| General Motors | Chevrolet | Silverado 1500 | 2000-2007 |
| General Motors | Chevrolet | Silverado 1500 | 2007-2014 |
| General Motors | Chevrolet | Silverado 2500 | 2000-2007 |
| General Motors | Chevrolet | Silverado 2500 | 2007-2014 |
| General Motors | Chevrolet | Silverado 3500 | 2000-2007 |
| General Motors | Chevrolet | Silverado 3500 | 2007-2014 |
| General Motors | Chevrolet | SSR | 2003-2005 |
| General Motors | Chevrolet | Suburban 1500 | 2000-2006 |
| General Motors | Chevrolet | Suburban 1500 | 2007-2014 |
| General Motors | Chevrolet | Suburban 2500 | 2007-2013 |
| General Motors | Chevrolet | Tahoe 1500 | 2000-2006 |
| General Motors | Chevrolet | Tahoe 1500 | 2007-2014 |
| General Motors | Chevrolet | Trailblazer | 2003-2009 |
| General Motors | Chevrolet | Trailblazer EXT | 2003-2006 |
| General Motors | Chevrolet | Traverse | 2009-2017 |
| General Motors | Chevrolet | Trax | 2014-2017 |
| General Motors | Chevrolet | Uplander | 2005-2008 |
| General Motors | Chevrolet | Venture | 2000-2005 |
| General Motors | Chevrolet | Volt | 2011-2015 |
| General Motors | GMC | Canyon | 2015-2017 |
| General Motors | GMC | Savana 1500 | 2003-2017 |
| General Motors | GMC | Savana 2500 | 2003-2017 |
| General Motors | GMC | Savana 3500 | 2003-2017 |
| General Motors | GMC | Sierra 1500 | 2000-2007 |
| General Motors | GMC | Sierra 1500 | 2007-2014 |
| General Motors | GMC | Sierra 2500 | 2000-2007 |
| General Motors | GMC | Sierra 2500 | 2007-2014 |
| General Motors | GMC | Sierra 3500 | 2000-2007 |
| General Motors | GMC | Sierra 3500 | 2007-2014 |
| General Motors | GMC | Terrain | 2010-2017 |
| General Motors | GMC | Yukon 1500 | 2000-2006 |
| General Motors | GMC | Yukon 1500 | 2007-2014 |
| General Motors | GMC | Yukon XL 1500 | 2000-2006 |
| General Motors | GMC | Yukon XL 1500 | 2007-2014 |
| General Motors | GMC | Yukon XL 2500 | 2000-2006 |
| General Motors | GMC | Yukon XL 2500 | 2007-2014 |
| General Motors | GMC | Acadia | 2017 |
| General Motors | GMC | Acadia | 2007-2016 |
| General Motors | GMC | Envoy | 2003-2009 |
| General Motors | GMC | Envoy XL | 2003-2006 |
| General Motors | GMC | Envoy XUV | 2004-2005 |
| General Motors | Hummer | H2 | 2003-2009 |

| General Motors | Hummer | H3 | 2006-2010 |
|---|---|---|---|
| General Motors | Isuzu | Ascender | 2003-2008 |
| General Motors | Oldsmobile | Silhoutte | 2000-2004 |
| General Motors | Oldsmobile | Bravada | 2002-2004 |
| General Motors | Oldsmobile | Silhoutte | 2005-2008 |
| General Motors | Pontiac | Aztek | 2002-2007 |
| General Motors | Pontiac | Bonniville | 2002-2005 |
| General Motors | Pontiac | Montana | 2000-2004 |
| General Motors | Pontiac | Montana | 2005-2009 |
| General Motors | Pontiac | Sunfire | 2000-2005 |
| General Motors | Pontiac | G6 | 2005-2010 |
| General Motors | Pontiac | Grand Am | 2005-2006 |
| General Motors | Pontiac | Torrent | 2006-2009 |
| General Motors | Saab | Saab 9-3 | 2003-2012 |
| General Motors | Saab | Saab 9-5 | 2010-2012 |
| General Motors | Saturn | Aura | 2007-2010 |
| General Motors | Saturn | Outlook | 2007-2010 |
| General Motors | Saturn | Relay | 2005-2008 |
| General Motors | Saturn | Vue | 2002-2007 |
| Hyundai | Hyundai | Accent | 2012-2017 |
| Hyundai | Hyundai | Azera | 2006-2011 |
| Hyundai | Hyundai | Elantra | 2007-2017 |
| Hyundai | Hyundai | Genesis | 2009-2013 |
| Hyundai | Hyundai | Sonata | 2009-2010 |
| Hyundai | Hyundai | Tiburon | 2003-2005 |
| Hyundai | Hyundai | Tucson | 2005 |
| Hyundai | Hyundai | Tucson | 2007-2010 |
| Hyundai | Hyundai | XG350 | 2002-2005 |
| Kia | Kia | Amanti | 2006-2009 |
| Kia | Kia | Forte | 2014-2016 |
| Kia | Kia | Optima | 2001-2006 |
| Kia | Kia | Rio | 2009-2011 |
| Kia | Kia | Rondo | 2007-2010 |
| Kia | Kia- | Sedona | 2006-2014 |
| Kia | Kia | Sportage | 2005-2016 |

## VI.   DEFENDANTS' INADEQUATE RECALLS AND FAILURE TO ASSIST IMPACTED CONSUMERS

91.     The Class Vehicles are not safe to drive. Due to Defendants' failures, Plaintiff and

Class Members are left with poor options: be without the use of a vehicle; purchase, lease, or rent

28

a new vehicle until Defendants first issue and then complete the recall; or use a vehicle with a dangerous or disabled airbag over an extended period of time. These are all, obviously, entirely unacceptable alternatives.

92.     Consequently, because of the inherently dangerous nature of the defect at issue in the class vehicles, Defendants should be compelled to either: (1) provide replacement vehicles; and/or (2) purchase the class vehicles at a fair value calculated for a comparable vehicle with a safe functioning airbag.

## VII.   CLASS ACTION ALLEGATIONS

93.      "Class Vehicles" refers to all vehicles purchased or leased in the United States that have hybrid inflators manufactured by Defendant ARC.

94.     The Classes' claims all derive directly from a single course of conduct by ARC and the General Motors Defendants. This case is about the responsibility of ARC and the General Motors Defendants, at law and in equity, for their knowledge, their conduct, and their products. ARC and the General Motors Defendants have engaged in uniform and standardized conduct toward the Classes. They did not differentiate, in degree of care or candor, their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Accordingly, Plaintiff brings this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

## The Nationwide Class

95.     Plaintiff brings this action and seek to certify and maintain it as a class action under

Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on behalf of

himself and a Nationwide Class defined as follows:

> **All consumer residents in the United States who own, owned, lease, or leased
> a Class Vehicle.**

## The State Class

96.     Plaintiff alleges statewide class action claims on behalf of the class in New Jersey.

This State Class is initially defined as follows:

> **All consumers who leased or purchased one or more of the Class Vehicles in
> the State of New Jersey, inclusive of all such consumers residing anywhere in
> the United States.**

97.     The Nationwide Class, Statewide Class, and their members are sometimes referred

to herein as the "Class" or "Classes."

98.     To the extent warranted, the list of Class Vehicles for the purpose of the Nationwide

Class and Statewide Class definitions will be supplemented to include other vehicles that have

ARC Inflators that may be defective.

99.     Excluded from each Class are ARC and the General Motors Defendants, their

employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned

subsidiaries or affiliates of ARC and the General Motors Defendants; Class Counsel; and the

judicial officers and their immediate family members and associated court staff assigned to this

case.

100.    Plaintiff reserve the right to amend the Class definitions if discovery and further

investigation reveal that any Class should be expanded, reduced, divided into subclasses under

Rule 23(c)(5), or otherwise modified. The Class and Sub-Classes are collectively referred to herein as the "Classes."

### A.    Numerosity: Federal Rule of Civil Procedure 23(a)(1)

101.    The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. There are millions of Class Vehicles and Class members nationwide. The precise number and identities of Nationwide Class and State Class members may be ascertained from Defendants' records and motor vehicle regulatory data. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

### B.    Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)

102.    This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These include, without limitation, the following:

a.    Whether the Defect exists in the Class Vehicles;

b.    Whether Defendants knew, or should have known, about the Defect, and, if so, how long they have known or should have known about it;

c.    Whether the Defect presents a safety risk;

d.    Whether Defendants had a duty to disclose the Defect in the Class Vehicles and the associated safety risks to consumers including Plaintiff and Class members;

e.    Whether Defendants breached their duty to disclose the Defect and/or that the Defect presents a safety risk;

f.      Whether Defendants' representations and certifications concerning vehicle safety were deceptive, false, and/or misleading given the Defect and the risk that the Defective Airbags will deploy without a collision and maim or kill drivers and passengers;

g.      Whether Defendants fraudulently concealed the Defect;

h.      Whether Defendants negligently or falsely misrepresented or omitted material facts regarding the Defect and/or that the Defect presents a safety risk;

i.      Whether Defendants made material misrepresentations and/or omissions concerning the standard, quality, or grade of Class Vehicles and the Defect;

j.      Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices, in trade or commerce, by failing to disclose the Defect and/or that the Class Vehicles were designed, manufactured, and sold with Defective airbags components;

k.      Whether the Class Vehicles were unfit for the ordinary purposes for which they were used in violation of the implied warranty of merchantability;

l.      Whether Defendants were unjustly enriched by the conduct alleged herein;

m.      Whether Defendants' unfair and deceptive acts, misrepresentations, and failure to disclose and/or concealment of the Defect caused Plaintiff and Class members to overpay for their Class Vehicles;

n.      Whether members of the Classes would pay less for a Class Vehicle if Defendants, at the time of purchase, disclosed the Defect and/or that the Defect presents a safety risk;

o.      Whether members of the Classes would have purchased a Class Vehicle if Defendants, at the time of purchase, disclosed the Defect and/or that the Defect presents a safety risk;

p.      Whether members of the Classes would have had the Defect repaired if Defendants had disclosed, prior to the expiration of the warranty period, the Defect and/or that the Defect presents a safety risk;

q.      Whether Plaintiff and Class members are entitled to damages and other monetary relief and, if so, in what amount.

### C.      Typicality: Federal Rule of Civil Procedure 23(a)(3)

103.    Plaintiff's claims are typical of the Class members' claims whom they seek to represent under Fed. R. Civ. P. 23(a)(3), because Plaintiff and Class members purchased or leased a Class Vehicle and were comparably injured through Defendants' wrongful conduct as described above. Plaintiff and the other Class members suffered damages as a direct proximate result of the same wrongful practices by Defendants. Plaintiff's claims arise from the same practices and courses of conduct that give rise to the claims of the other Class members. Plaintiff's claims are based on the same legal theories as the claims of the other Class members.

### D.      Adequacy: Federal Rule of Civil Procedure 23(a)(4)

104.    Plaintiff will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiff's interests do not conflict with the interests of the Class members. Plaintiff have retained counsel competent and experienced in complex class action litigation, including automobile defect litigation and other consumer protection litigation. Plaintiff intend to prosecute this action vigorously. Neither Plaintiff nor his counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

**E.**   **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)**

105.   Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, for the Class as a whole.

**F.**   **Superiority: Federal Rule of Civil Procedure 23(b)(3)**

106.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its management. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to litigate their claims individually against Defendants such that it would be impracticable for members of the Classes to individually seek redress for Defendants' wrongful conduct.

107.   Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**VIII.   ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED**

108.   Any applicable statute of limitations has been tolled by Defendants' knowing, willful, and active concealment of the Defect and the omissions alleged herein. Through no fault or lack of diligence, Plaintiff and members of the Classes were deceived regarding the Class Vehicles and could not have reasonably discovered the Defect or Defendants' deception with respect to the Defect.

109.    Plaintiff and members of the Classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a defect and/or that the Class Vehicles contained a Defect and corresponding safety risk. As alleged herein, the existence of the Defect was material to Plaintiff and members of the Classes at all relevant times. Within the time period of any applicable statutes of limitation, Plaintiff and members of the Classes could not have discovered through the exercise of reasonable diligence the existence of the Defect or that Defendants were concealing the Defect.

110.    At all times, Defendants are and were under a continuous duty to disclose to Plaintiff and members of the Classes the true standard, quality, and grade of the Class Vehicles and to disclose the Defect and corresponding safety risk.

111.    Defendants knowingly, actively, and affirmatively concealed the facts and underlying deceptive conduct alleged herein. Plaintiff and members of the Classes reasonably relied on Defendants' knowing, active, and affirmative concealment. Plaintiff could not have reasonably discovered the Defect through due diligence.

112.    For these reasons, all applicable statutes of limitations have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## NATIONWIDE STATE-LAW CLAIMS AGAINST ARC AUTOMOTIVE, INC.

### COUNT 1
### FRAUDULENT CONCEALMENT

113.    Plaintiff brings this claim on behalf of the Nationwide Class under New Jersey law, because, with respect to the facts and issues relevant to this case, there are no true conflicts (case-dispositive differences) among various states' law of fraudulent concealment. In the alternative, if

New Jersey law does not apply, it is brought under the laws of the states where Plaintiff and Class Members reside.

114.　　ARC concealed and suppressed material facts regarding the Defective Airbags—most importantly concerning the Inflator Defect and the safety risk it presents, including that upon rupture it may expel metal shrapnel that tears through the airbag and cause serious injury or death to occupants.

115.　　ARC took affirmative steps to ensure that its employees did not reveal the Inflator Defect to regulators or consumers.

116.　　On information and belief, ARC still has not made full and adequate disclosure, continues to defraud Plaintiff and the Class, and continues to conceal material information regarding the Inflator Defect that exists in the Defective Airbags.

117.　　ARC had a duty to disclose the defect because it:

a.　　Had exclusive and/or far superior knowledge and access to the facts than Plaintiff and Class Members, and ARC knew the facts were not known to or reasonably discoverable by Plaintiff and the Class;

b.　　Intentionally concealed the foregoing from Plaintiffs;

c.　　Was required to accurately describe the vehicle's air bag system in an easily understandable format under 49 C.F.R. § 571.208 S4.5.1(f)(1);

d.　　Was required to provide any necessary precautions regarding the proper positioning of occupants to ensure maximum safety protection of those occupants within the owner's manual under 49 C.F.R. § 571.208 S4.5.1(f)(1); and

e.　　Made incomplete representations about the safety and reliability of the Defective Airbags and, by extension, the Class Vehicles, while purposefully withholding material facts from Plaintiff that contradicted these representations.

f.　　ARC concealed and suppressed the material facts concerning the statements affixed to the Class Vehicles under 49 C.F.R. § 567.4 (g) (5).

118.　　These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing or retaining a new or used motor vehicle, and because

they directly impact the value of the Class Vehicles purchased or leased by Plaintiff and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiff and Class Members trusted Defendants not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

119.    ARC concealed and suppressed these material facts to falsely assure purchasers and consumers that its airbags were capable of performing safely, as represented by ARC and reasonably expected by consumers.

120.    ARC actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and to avoid recalls that would hurt the brand's image and negatively impact ARC's financial bottom line. ARC concealed these facts at the expense of Plaintiff and the Class.

121.    Plaintiff and the Class were unaware of these omitted material facts, and would not have acted as they did if they had known of the concealed and/or suppressed facts.

122.    Had they been aware of the Defective Airbags, and ARC's callous disregard for safety, Plaintiff and the Class either would have paid less for their Class Vehicles or would not have purchased or leased them at all. Plaintiff did not receive the benefit of their bargain as a result of ARC's fraudulent concealment.

123.    Because of the concealment and/or suppression of the facts, Plaintiff and the Class sustained damage because they own vehicles that diminished in value as a result of ARC's concealment of, and failure to timely disclose, the serious defects in millions of Class Vehicles and the serious safety and quality issues caused by ARC's conduct.

124.    The value of all Class members' vehicles has diminished as a result of ARC's fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to

purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

125.     Accordingly, ARC is liable to the Class for their damages in an amount to be proven at trial.

126.     ARC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being, and with the aim of enriching ARC. ARC's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 2
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

127.     Plaintiff brings this Claim on behalf of the Nationwide Class under New Jersey law. In the alternative, if New Jersey law does not apply, it is brought under the laws of the states where Plaintiff and Class Members reside.

128.     ARC is and was at all relevant times merchants with respect to motor vehicle component parts, such as airbag inflators and sellers of motor vehicle component parts, such as airbag inflators.

129.     The Class Vehicles and component parts, such as airbag inflators, are and were at all relevant times goods.

130.     A warranty that the Class Vehicles and component parts, such as airbag inflators, with the Inflator Defect were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law.

131.    The Class Vehicles and component parts, such as airbag inflators, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which these goods are used, because the Defective Airbags contain the Inflator Defect, leading to an unreasonable likelihood of serious bodily injury and death.

132.    ARC was provided notice of the airbag problems through internal investigations and by many individual letters and communications with the General Motors or within a reasonable amount of time after ARC and the other Defendants issued the recalls and the allegations of the Airbag Defect became public. Moreover, ARC and the other defendants were aware of these problems long before Plaintiff and the Class and had ample notice and opportunity to correct them.

133.    As a direct and proximate result of ARC's breach of the implied warranty of merchantability, Plaintiff and the Class have been damaged in an amount to be proven at trial.

### COUNT 3
### NEGLIGENT MISREPRESENTATION

134.    Plaintiff brings this claim on behalf the Nationwide Class under New Jersey law, because, with respect to the facts and issues relevant to this case, there are no true conflicts (case-dispositive differences) among various states' law of negligent misrepresentation. In the alternative, if New Jersey law does not apply, it is brought under the laws of the states where Plaintiff and Class Members reside.

135.    ARC owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff and Class members because ARC knew or should have known of the Inflator Defect and the risks associated with the manifestation of the Inflator Defect. ARC also made partial disclosures regarding the safety of the component parts of the Class Vehicles, such as airbag inflators, while ARC either knew or should have known that these Class Vehicles possessed the

Inflator Defect and failed to disclose its existence and its corresponding safety hazard. ARC was required to accurately describe the vehicle's air bag system in an easily understandable format and to disclose any necessary precautions regarding the proper positioning of occupants to ensure maximum safety protection of those occupants within the owner's manual under 49 C.F.R. § 571.208 S4.5.1(f)(1).

136.    ARC negligently misrepresented and omitted material facts concerning the standard, quality, or grade of the component parts of the Class Vehicles and the existence of the Inflator Defect exposing drivers and occupants to safety risks. As a direct result of Defendants' negligent conduct, Plaintiff and Class members have suffered actual damages.

137.    The Inflator Defect is material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. The Inflator Defect may cause the inflator to rupture and expel metal shrapnel that poses a threat of serious injury or death to occupants. No reasonable consumer expects a component part of a vehicle to contain a defect in design and manufacturing, such as the Inflator Defect, that can cause serious injury or death to consumers.

138.    Plaintiff and Class members would not have purchased the Class Vehicles but for ARC's negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles. Plaintiff and Class members justifiably relied upon ARC's negligent false representations and omissions of material facts.

139.    As a direct and proximate result of ARC's negligent false representations and omissions of material facts regarding the standard, quality or grade of the Class Vehicles with the Inflator Defect, Plaintiff and Class members have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## COUNT 4
## UNJUST ENRICHMENT

140.    This claim for unjust enrichment is brought on behalf of the Nationwide Class under New Jersey law. If New Jersey law does not apply, it is brought in the alternative under the laws of the states where Plaintiff and Class members reside.

141.    ARC has received and retained a benefit from the Plaintiff and inequity has resulted.

142.    ARC benefitted from selling Defective Airbags for more than they were worth, at a profit, and Plaintiff have overpaid for the Class Vehicles as a result, and have been forced to pay other costs.

143.    It is inequitable for ARC to retain these benefits.

144.    As a result of ARC's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## NATIONWIDE STATE-LAW CLAIMS AGAINST
## THE GENERAL MOTORS DEFENDANTS

## COUNT 5
## FRAUDULENT CONCEALMENT

145.    Plaintiff brings this claim on behalf of the Nationwide Class against the General Motors Defendants (as defined above) under the laws of New Jersey. In the alternative, if New Jersey law does not apply, it is brought under the laws of the states where Plaintiff and Class Members reside.

146.    The General Motors Defendants concealed and suppressed material facts regarding the Defective Airbags— most importantly concerning the Inflator Defect and the safety risk it presents, including that upon rupture it may expel metal shrapnel that tears through the airbag and cause serious injury or death to occupants.

147.    The General Motors Defendants took steps to ensure that its employees did not reveal known safety defects to regulators or consumers.

148.    On information and belief, the General Motors Defendants have still not made full and adequate disclosure regarding defects that exist in the Class Vehicles, and continue to defraud and conceal material information from Plaintiff and the Class.

149.    The General Motors Defendants had a duty to disclose the Inflator Defect because each Defendant:

a.      Had exclusive and/or far superior knowledge and access to the facts, and

b.      the General Motors Defendants knew the facts were not known to or reasonably discoverable by Plaintiff and the Class;

c.      Intentionally concealed the foregoing from Plaintiffs;

d.      Were required to accurately describe the vehicle's air bag system in an easily understandable format under 49 C.F.R. § 571.208 S4.5.1(f)(1);

e.      Were required to provide any necessary precautions regarding the proper positioning of occupants to ensure maximum safety protection of those occupants within the owner's manual under 49 C.F.R. § 571.208 S4.5.1(f)(1); and

f.      Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiff that contradicted these representations. These incomplete representations include representations made under with 49 C.F.R. § 567.4.

150.    These omitted and concealed facts were material because they would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer. Indeed, Plaintiff and Class Members trusted the General Motors Defendants not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

151.    The General Motors Defendants concealed and suppressed these material facts in order to falsely assure purchasers and consumers that its vehicles were capable of performing safely as represented by the General Motors Defendants and reasonably expected by consumers.

152.    The General Motors Defendants actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost the General Motors Defendants money, and it did so at the expense of Plaintiff and the Class.

153.    Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

154.    Because of the concealment and/or suppression of the facts, Plaintiff and the Class sustained damage because they own vehicles that diminished in value as a result of the General Motors Defendants' concealment of, and failure to timely disclose, the serious defects in millions of Class Vehicles and the serious safety and quality issues caused by the General Motors Defendants' conduct.

155.    Had they been aware of the Defective Airbags installed in their Class Vehicles, and the General Motors Defendants' callous disregard for safety, Plaintiff and the Class either would have paid less for their Class Vehicles or would not have purchased or leased them at all. Plaintiff did not receive the benefit of their bargain as a result of ARC's fraudulent concealment.

156.    The value of all Class members' vehicles has diminished as a result of the General Motors Defendants' fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

157.     Accordingly, the General Motors Defendants are liable to the Class for their damages in an amount to be proven at trial.

158.     The General Motors Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being, and with the aim of enriching the General Motors Defendants. the General Motors Defendants' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof

## COUNT 6
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

159.     Plaintiff brings this claim on behalf of the Nationwide Class against the General Motors Defendants (as defined above) under the laws of New Jersey. In the alternative, if New Jersey law does not apply, it is brought under the laws of the states where Plaintiff and Class Members reside.

160.     The General Motors Defendants are and were at all relevant times merchants with respect to motor vehicles and sellers of motor vehicles.

161.     The Class Vehicles are and were at all relevant times goods.

162.     A warranty that the Class Vehicles with the Inflator Defect were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law.

163.     When Plaintiff and the Class purchased or leased their Class Vehicles, the transaction contained an implied warranty that the Class Vehicles were in merchantable condition.

164.     At the time of sale and all times thereafter, the Class Vehicles were not merchantable and not fit for the ordinary purpose for which cars are used. Specifically, the Class

Vehicles are inherently defective in that they are equipped with Defective Airbags with the Inflator Defect that have a resulting propensity to rupture and expel metal shrapnel that poses a threat of serious injury or death to occupants.

165.   On information and belief, the General Motors Defendants had notice of these issues by numerous complaints filed against them, internal investigations, and by the ongoing NHTSA Investigation into the Defective Airbags containing the Inflator Defect.

166.   As a direct and proximate result of the General Motors Defendants' breach of the warranties of merchantability, Plaintiff and the Class have been damaged in an amount to be proven at trial.

## COUNT 7
## NEGLIGENT MISREPRESENTATION

167.   Plaintiff brings this claim on behalf the Nationwide Class under New Jersey law, because, with respect to the facts and issues relevant to this case, there are no true conflicts (case-dispositive differences) among various states' law of negligent misrepresentation. In the alternative, if New Jersey law does not apply, it is brought under the laws of the states where Plaintiff and Class Members reside.

168.   The General Motors Defendants owed a duty to disclose the Inflator Defect and its corresponding safety risk to Plaintiff and Class members because Defendants knew or should have known of the Inflator Defect and the risks associated with the manifestation of the Inflator Defect. The General Motors Defendants also made partial disclosures regarding the safety of the Class Vehicles while the General Motors Defendants either knew or should have known that the Class Vehicles possessed the Inflator Defect and failed to disclose its existence and its corresponding safety hazard.

169.    The General Motors Defendants negligently misrepresented and omitted material facts, in owners' manuals, maintenance schedules, the § 567.4 Placard, or elsewhere, concerning the standard, quality, or grade of the Class Vehicles and the existence of the Inflator Defect exposing drivers and occupants to safety risks. The General Motors Defendants misrepresented that they would remedy any defects under the express warranties but limited their coverage to mechanical defects. As a direct result of the General Motors Defendants' negligent conduct, Plaintiff and Class members have suffered actual damages.

170.    The Inflator Defect is material because it presents a safety risk and places the driver and occupants at risk of serious injury or death. The Inflator Defect may cause the inflator to rupture and expel metal shrapnel that poses a threat of serious injury or death to occupants. No reasonable consumer expects a vehicle to contain a defect in design, such as the Inflator Defect, that can cause serious injury or death to consumers.

171.    Plaintiff and Class members would not have purchased the Class Vehicles but for the General Motors Defendants' negligent omissions of material facts regarding the nature and quality of the Class Vehicles and existence of the Inflator Defect and corresponding safety risk, or would have paid less for the Class Vehicles. Plaintiff and Class members justifiably relied upon the General Motors Defendants' negligent false representations and omissions of material facts.

172.    As a direct and proximate result of the General Motors Defendants' negligent false representations and omissions of material facts regarding the standard, quality or grade of the Class Vehicles with the Inflator Defect, Plaintiff and Class members have suffered an ascertainable loss and actual damages in an amount to be determined at trial.

## COUNT 8
## UNJUST ENRICHMENT

173.     This claim for unjust enrichment is brought on behalf of Plaintiff and the Nationwide Class against the General Motors Defendants under New Jersey law. In the alternative, if New Jersey law does not apply, it is brought under the laws of the states where Plaintiff and Class Members reside.

174.     The General Motors Defendants have received and retained a benefit from the Plaintiff and inequity has resulted.

175.     The General Motors Defendants benefitted from selling Class Vehicles for more than they were worth, at a profit, and Plaintiff have overpaid for the Class Vehicles as a result, and been forced to pay other costs.

176.     It is inequitable for the General Motors Defendants to retain these benefits.

177.     As a result of the General Motors Defendants' conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendants and in favor of Plaintiff and the Classes, and award the following relief:

A.     An order certifying the proposed Classes designating Plaintiff as the named representatives of the Classes, and designating the undersigned as Class Counsel;

B.     A declaration that the airbags in Class Vehicles are defective;

C.     A declaration that the Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

D.     An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Class Vehicles;

E.      An award to Plaintiff and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, in an amount to be proven at trial;

F.      An award to Plaintiff and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

G.      A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket expenses and damages claims associated with the Defective Airbags in Plaintiff's and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defective Airbags;

H.      A declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiff and Class Members;

I.      An award of attorneys' fees and costs, as allowed by law;

J.      An award of prejudgment and post judgment interest, as provided by law;

K.      Leave to amend this Complaint to conform to the evidence produced at trial; and

L.      Such other relief as may be appropriate under the circumstances.

## IX.    **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

DATED: September 26, 2022

Christopher A. Seeger
Christopher L. Ayers
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 679-8656
cseeger@seegerweiss.com
cayers@seegerweiss.com

Respectfully submitted,

*/s/ James E. Cecchi*
James E. Cecchi
Caroline F. Bartlett
**CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
cbartlett@carellabyrne.com
jsteele@carellabyrne.com

Zachary S. Bower*
**CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C.**
2222 Ponce DeLeon Blvd.
Miami, Florida 33134
Telephone: 973-422-5593
Facsimile: 973-994-1744
zbower@carellabyrne.com

*Attorneys for Plaintiff and the Proposed Class*
*\* To be admitted pro hac vice*